**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

− − − − − − − − − − − − − − − − − − − − − − − − − − − − − X

LAD (AVIATION), INC. d/b/a CHARLES TAYLOR
ADJUSTING,

                          Plaintiff,

           -against-

ROY ESTES,

                        Defendant.

− − − − − − − − − − − − − − − − − − − − − − − − − − − − − X

Case No.

**VERIFIED COMPLAINT**

**(Jury Trial Demanded)**

        Plaintiff LAD (Aviation), Inc. d/b/a Charles Taylor Adjusting ("Charles Taylor" or the "Company"), files this Complaint against its former employee, Defendant Roy Estes ("Estes" or "Defendant"), and aver as follows:

**<u>INTRODUCTION</u>**

        1.     Estes was employed by Charles Taylor from September 6, 2019 until his termination by the Company on January 25, 2023. Most recently, and at the time of his termination, Estes was a member of the Company's leadership team, holding the position of Senior Vice President and Senior Executive General Adjuster. In this role, Estes worked directly with—and was directly responsible for—Charles Taylor's relationships with clients, employees, and independent contractors. But instead of managing those relationships for the Company's benefit, as he was required to do both by law and by the terms of his employment agreements, Estes exploited Charles Taylor's business relationships, goodwill, and confidential information to illegally and improperly build his own competing business.

        2.     Estes's plan worked like this: *First*, he created his own competing business, Claims Management Group, Inc. and developed a comprehensive financial plan for that business, all while still employed by Charles Taylor. *Second*, also while still employed, he solicited Charles Taylor

clients for Claims Management Group, transitioned his Charles Taylor client matters to Claims Management Group, transferred Charles Taylor client contact information and records to Claims Management Group, and solicited Charles Taylor employees and contractors to work for Claims Management Group.

3.     Estes never informed Charles Taylor of his secretive and illegal plan. Even worse, he gave the clients that he solicited for his new company the false impression that Charles Taylor had in fact consented to his efforts to transition their business to Claims Management Group. This was false. Charles Taylor had no idea of Estes' scheme and Estes had no intent of ever revealing his scheme.

4.     These blatant actions by Estes not only breached his fiduciary duty of loyalty as a Charles Taylor employee, but also were clear and intentional violations of his restrictive covenant agreements with Charles Taylor. Among other obligations, those agreements specifically prohibited Estes from (1) competing with Charles Taylor both during his employment and for six months following his separation, (2) soliciting or performing services for Charles Taylor's clients for the benefit of a competitor both during his employment and for one year following his separation, (3) soliciting, employing, or retaining Charles Taylor's employees or independent contractors for the benefit of a competitor both during his employment and for one year following his separation, and (4) at any time, misappropriating Charles Taylor's confidential and proprietary information.

5.     Upon learning of Estes's scheme, Charles Taylor promptly terminated Estes's employment for cause, reminded Estes of his continuing legal and contractual obligations, and demanded that Estes cease and desist from his competitive activities. But Estes was undeterred.

To this day, Estes continues to plow forward unabated with his plan to unlawfully gain as much of a competitive advantage over Charles Taylor as possible.

6.      Because Estes is continuing to actively violate his legal and contractual obligations to Charles Taylor, the Company now asks this Court to award the preliminary and permanent relief against Estes for:

(a)      Breach of the obligations contained in his Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement with Charles Taylor;

(b)      Breach of the obligations contained in the Investment and Shareholders' Deed he entered into with Charles Taylor's related affiliate, Jewel Topco;

(c)      Breach of his fiduciary duty and/or duty of loyalty owed to Charles Taylor;

(d)      Unfair competition in violation of state law;

(e)      Tortious interference with Charles Taylor's contractual relationship with at least one of its employees, Andrew Sanchez;

(f)      Tortious interference with Charles Taylor's business relations with current and prospective clients, customers, and business partners; and

(g)      Misappropriation of Charles Taylor's confidential information.

## PARTIES

7.      Plaintiff LAD (Aviation), Inc. d/b/a Charles Taylor Adjusting is a Texas corporation with its principal place of business at 5868 Westheimer Road, 1A, Box 511, Houston, Texas 77057.

8.      Defendant Roy Estes is an individual domiciled and resident in the State of Florida at 4165 Mourning Dove Court, Melbourne, Florida 32934-8523.

## JURISDICTION AND VENUE

9.      This Court has diversity-based subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because this is a dispute between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     The Court may exercise personal jurisdiction over Estes because Estes entered into a Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement ("Restrictive Covenants Agreement") in which he consented to personal jurisdiction in the state and federal courts of New York, and Charles Taylor's causes of action arise out of that agreement.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because Estes consented to venue in this District in the Restrictive Covenants Agreement and waived any objections to jurisdiction and venue.

## RELEVANT FACTS

### Industry Background

12.     Charles Taylor is a global leader in the insurance claim adjusting industry, with its claims adjusting services covering aviation, natural resources, marine, property, casualty, technical and special risks insurance claims.

13.     Charles Taylor focuses on commercial losses and insurance claims across all major lines and geographies, many of which are large-scale and complex in nature. The Company handles onshore and offshore energy claims, maritime casualties, aircraft losses, and specialist property and casualty claims for a variety of insurance companies to assist in determining whether claims should be paid and, if so, how much the insurance company should pay.

14.     The claims adjusting industry is highly competitive, and Charles Taylor invests heavily in maintaining a competitive advantage, including by developing, and maintaining, goodwill through its relationships with current and prospective clients and business partners, and developing confidential business strategies.

15.     As a result, the protection of Charles Taylor's business goodwill and relationships, and its confidential and proprietary information, is critical to preventing competitors or would-be competitors from obtaining an unfair competitive advantage over the Company.

**Charles Taylor's Protection of Its Business Goodwill and Confidential Information**

16.     In order to protect its investment, Charles Taylor requires that its employees sign the Restrictive Covenants Agreement, which protects against the misappropriation, use, or disclosure of "Confidential Information," which "includes but is not limited to information containing or concerning business strategies and opportunities, customers, prospective customers, current and prospective business partners, pricing practices, contracts, marketing and all other information that belongs to or relates to the Company and its business that is essential to the protection of the goodwill of the Company and/or any Affiliate and to the maintenance of their competitive position in the industry, and/or that the disclosure or improper use of which would be highly detrimental to the Company and/or any Affiliate."

17.     The Restrictive Covenants Agreement further protects Charles Taylor's goodwill and confidential information by prohibiting the solicitation of Charles Taylor's clients, suppliers, employees, consultants, and independent contractors.

18.     Additionally, Charles Taylor maintains the secrecy of its Confidential Information, and the client information relating to its goodwill, by housing that information in its internal computer systems. Access to Charles Taylor's computer systems is password-protected and limited to Charles Taylor employees; the systems are not available to the general public.

**Estes's Employment with Charles Taylor and His Contractual Obligations**

19.     On September 6, 2019, Estes began employment with Charles Taylor as an Executive General Adjuster.

20.     The same day, Estes executed the Restrictive Covenants Agreement, in which he agreed to several provisions designed to protect Charles Taylor's confidential information. (A true and correct copy of Estes's Restrictive Covenants Agreement is attached hereto as **Exhibit A**.)

21.     First, Estes acknowledged and agreed that his "position is a position of trust and responsibility with access to Confidential Information, trade secrets, and other information concerning employees, customers, and potential business opportunities of the Company." (Ex. A § 1.1.) Estes further acknowledged and agreed that "the Company's Confidential Information, trade secrets, and other information concerning employees, customers, and potential business opportunities of the Company and the relationship between the Company and each of its employees, customers, and current and potential business partners are valuable assets which may not be used for any purpose other than the Company's business." (*Id.* § 1.2.) Additionally, Estes acknowledged and agreed that "the names of customers and current and potential business partners are considered Confidential Information of the business which constitute valuable, special, and unique property of the Company," and that "the Company's customer and current and potential business partner lists and information which have been compiled by the Company represent a material investment of the Company's time and money." (*Id.*) Finally, Estes acknowledged and agreed that "the restrictions contained in this Agreement, including, but not limited to, the restrictive covenants set forth in Sections 5-10 below, are reasonable and necessary to protect the Company's legitimate business interests, promote and protect the purpose and subject matter of this Agreement and Employee's employment, [and]deter any potential conflict of interest." (*Id.* § 1.3.)

22.     Second, Estes recognized Charles Taylor's "proprietary rights in the tangible and intangible property of the Company" and acknowledged that he had "not obtained or acquired and

shall not obtain or acquire any personal property rights in any of the property of the Company." (*Id.* § 3.1.) Estes agreed that during his employment "and any time afterwards all Materials shall be the sole and exclusive property of the Company," and he agreed "to hold all Materials in trust and strict confidence for the Company and its clients, without disclosing such information to any third parties, whether contained in Employee's memory or embodied in writing or other physical form." (*Id.* § 3.2.)[1]

23.      Third, Estes agreed to an express non-disclosure provision, acknowledging that he had and would have "access to proprietary and confidential information, data, trade secrets and knowledge (in whatever form) relating to the Company and/or any Affiliate and their respective businesses and affairs"—referred to as the "Confidential Information"—which "includes but is not limited to information containing or concerning business strategies and opportunities, customers, prospective customers, current and prospective business partners, pricing practices, contracts, marketing and all other information that belongs to or relates to the Company and its business that is essential to the protection of the goodwill of the Company and/or any Affiliate and to the maintenance of their competitive position in the industry, and/or that the disclosure or improper use of which would be highly detrimental to the Company and/or any Affiliate." (*Id.* § 5.1.)[2]

24.      Accordingly, and "[i]n recognition of the Company's need to protect the legitimate business interests of the Company and the Affiliates," Estes agreed during the course of his employment to keep and maintain Charles Taylor's Confidential Information "as strictly

---

[1] The Restrictive Covenants Agreement defined "Materials" to include, "without limitation, any writing, communications, manuals, documents, instruments, contracts, agreements, files, literature, data, technical information, know-how, software, secrets, formulas, products, methods, procedures, processes, devices, apparatuses, trademarks, trade names, trade styles, service marks, logos, copyrights, patents, inventions, discoveries, whether or not patentable, that are in any way related to the Company, the Affiliates, or their business." (*Id.* § 3.1.)

[2] Confidential Information is further defined to include "any and all information about the Company that is not generally known or available to the public, but has been developed, acquired or compiled by the Company." (*Id.* § 5.1.)

confidential and wholly owned by the Company and/or the applicable Affiliate." (*Id.*) Estes further agreed "not to, directly or indirectly: (i) misappropriate, disclose, transfer, assign, disseminate or otherwise communicate or make available (orally, in writing or otherwise) to any person or entity any Confidential Information, or any part thereof; or (ii) use or reproduce (in whatever form) any Confidential Information for Employee's own benefit or purposes or for the benefit or purposes of any person or entity, except as may be reasonably necessary in the performance of the duties and responsibilities of Employee hereunder and in the best interests of the Company or as otherwise may be authorized expressly in writing by the Company." (*Id.*) Moreover, Estes agreed that "any Confidential Information is the property of the Company and is essential to the maintenance of Company's competitive position and accordingly should be kept secret," and "specifically agree[d] to refrain from using to Employee's advantage, or to the advantage of any other person, corporation, partnership, firm or entity, any Confidential Information gained from or in connection with Employee's employment." (*Id.* § 5.2.)

25.     The non-disclosure provision "survive[s] the termination of Employee's employment with the Company for any reason whatsoever and shall remain in full force and effect for either (a) five (5) years following the termination of Employee's employment for any reason for Confidential Information that does not constitute a trade secret under applicable law or (b) for Confidential Information that does constitute a trade secret under applicable law, so long as such information, data, or material constitutes a trade secret (in either case, the 'Confidentiality Period')." (*Id.* § 5.1.)

26.     Fourth, Estes agreed that, during his employment and for a period of one year from the date of his termination of employment for any reason, he would not "directly or indirectly, contact, solicit, accept solicited business from, provide services to, or in any way interfere with

the Company's relationship with any of the Company's current or prospective clients, customers, or suppliers," without the Company's consent and "for purposes of providing services that are the same as, similar to, substitutable for, or competitive with the services and/or products that the Company provided or offered during the last year of Employee's employment with the Company." (*Id.* § 7.) This restriction expressly applied to the Company's current or prospective clients, customers, or suppliers (1) that Estes "directly interacted" with, (2) that an employee supervised by Estes "directly interacted" with, or (3) about whom Estes "obtained or received non-public information." (*Id.*)

27.    Fifth, Estes similarly agreed that, during his employment and for a period of one year from the date of his termination of employment for any reason, he would not, on his own behalf or on behalf of any other person or entity, "directly or indirectly, solicit for employment or hire or assist in the solicitation or hiring of any employee, consultant, or independent contractor who worked for or is affiliated with the Company during the last year of Employee's employment with the Company and, during that time, either (i) reported, directly or indirectly. to Employee, (ii) worked with Employee on any Company-related project, product, or service, or (iii) worked for or with the same customer(s) as Employee." (*Id.* § 8.) This provision further states that Estes would be presumed to have violated this provision if, during the post-employment restricted period, "any business or enterprise in which Employee participates in any manner hires, engages, recruits, solicits, or induces any employee, consultant, or independent contractor covered by this provision." (*Id.*)

28.    Finally, Estes agreed to return all Company property "immediately upon the termination of [his] employment with the Company, for any reason." (*Id.* § 6.)

29.     In entering into the Restrictive Covenants Agreement, Estes acknowledged and agreed that "the covenants contained herein are intended to ensure that the Company, the Affiliates, and their respective businesses are not adversely affected by Employee acting in a manner contrary to this Agreement and thereby damaging the results, prospects, and goodwill associated with the business (both present and future) of the Company and/or any Affiliate; that a breach of any section of this Agreement will cause serious harm to the Company and/or the Affiliates; and that all of the covenants and restrictions contained herein are reasonable and valid and all defenses to the enforcement thereof are hereby expressly waived." (*Id.* § 10.2.)

30.     Among other remedies available to Charles Taylor for violations of the Restrictive Covenants Agreement, the parties agreed that "because of the immediate and irreparable damage that would be caused to the Company and for which monetary damages would not be a sufficient remedy and which harm would not be fully or adequately compensated by recovery of damages alone, Charles Taylor, "in addition to all other remedies and damages that may be available to the Company hereunder and at law or in equity, . . . shall be entitled to specific performance and any injunctive or other equitable relief as a remedy for any such breach without payment of any bond." (*Id.* § 10.3.)

31.     Estes agreed that the Restrictive Covenants Agreement would be "construed in accordance with the laws of the State of New York, regardless of any principles of conflicts of laws or choice of laws of any jurisdiction." (*Id.* § 12.) He further agreed that "if the jurisdictional prerequisites exist at the time, the federal courts located in New York, shall have exclusive jurisdiction to hear and determine any dispute or controversy arising under or concerning this Agreement. All jurisdictional requirements and objections to venue are deemed expressly waived by signing this Agreement below." (*Id.*)

32.     Throughout the first year of his employment with Charles Taylor, Estes was a productive and valued employee.

33.     During his employment with Charles Taylor, Estes was responsible for generating new client business and developing business with existing clients.

34.     Estes relied on Charles Taylor to help him develop client relationships by, for example, sponsoring client events, financing Estes's membership in professional and networking organizations, and investing in marketing and sales tools, all of which Estes used to form and strengthen client relationships on Charles Taylor's behalf. Estes also relied on the support of his team, comprised of Charles Taylor employees, to ensure his success.

35.     While employed by Charles Taylor, Estes gained valuable knowledge of Charles Taylor's current and prospective clients and business partners, including their business needs and preferences, as well as their fees paid to Charles Taylor, amounts paid in response to insurance claims, and other like information essential to clients' businesses.

36.     While employed by Charles Taylor, Estes likewise gained valuable knowledge of Charles Taylor's business practices and strategies, business opportunities, pricing practices, contracts, and marketing—in essence, the foundational elements that Charles Taylor relies upon to maintain and develop its competitive position in the industry.

**Estes Is Promoted and Awarded Equity and, in Return, Agrees Not to Compete**

37.     On September 16, 2020, in recognition of Estes's value to Charles Taylor, Estes was promoted to Senior Vice President and Senior Executive General Adjuster in Charles Taylor's Property division. In signing the offer letter for that position, Estes acknowledged and reaffirmed his restrictive covenants to the Company:

> During your employment with the Company, you have been provided with and have access to the Company's confidential

information and expected to handle confidential matters with discretion. Accordingly, this offer is contingent on your acceptance of, and compliance with, the Company's Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement— which includes provisions regarding your confidentiality, nondisclosure, and nonsolicitation obligations to the Company—a copy of which is enclosed with this offer letter. The covenants contained in the Proprietary Rights, Intellectual Property, and Restrictive Covenants Agreement are an integral part of your employment and your employment with the Company is contingent on your acceptance of that agreement.

(A true and correct copy of the Offer Letter dated September 16, 2020 is attached hereto as **Exhibit B**.)

38.     As part of the promotion, Estes's salary was increased to $185,000 per year, exclusive of incentive compensation and benefits. (*See id.* at 3.) The Offer Letter also noted that Estes would receive equity in the Company, to be addressed in a separate agreement. (*See id.*)

39.     To that end, and again in recognition of his value to Charles Taylor, Estes was offered the opportunity to attain equity by entering into an agreement with certain U.K.-based affiliates of Charles Taylor.

40.     Specifically, on February 5, 2021, Estes signed a Deed of Adherence which had the effect of making him a party to an Investment and Shareholders' Deed dated June 16, 2020 and entitling him to equity in the venture. (True and correct copies of the Deed of Adherence and relevant excerpts of the Investment and Shareholders' Deed are attached hereto as **Exhibits C** and **D**, respectively; Charles Taylor will file the entire Investment and Shareholders' Deed, which contains non-public information relating to the Company, with a motion to seal if so requested by the Court.)

41.     Under the terms of the Investment and Shareholders' Deed, Estes agreed that, during his employment, he would not "be concerned in any business (other than the business of the Group) whether or not in competition with any business carried on by the Group, without prior

written notification of the same." (Ex. D § 18.3(a).) Estes also agreed that, for six months following the cessation of his employment, he would not "be concerned in any business within any country which, in the 12-month period immediately preceding the [date of the cessation of his employment], competes with the business of all or any part of the Group." (*Id.* § 18.3(b).) The Investment and Shareholders' Deed defines the "Group" as "Topco and its subsidiary undertakings from time to time," and "Topco," in turn, is defined as Jewel Topco Ltd., an English corporate entity. (*Id.* § 1.1 and Parties Clause.) Charles Taylor is one of Jewel Topco's "subsidiary undertakings" as referenced in the Investment and Shareholders' Deed. Thus, in addition to the confidentiality and nonsolicitation obligations that Estes undertook in signing the Restrictive Covenants Agreement, Estes, through the Investment and Shareholders' Deed, further agreed not to compete with Charles Taylor for one year following the cessation of his employment.

### Estes Covertly Forms a Competing Business

42.     As Senior Vice President and Senior Executive General Adjuster, Estes continued to be a productive employee, generating nearly $1,000,000 in total revenue for Charles Taylor over the course of 2021 and 2022.

43.     However, at least as early as December 2022, and unbeknownst to Charles Taylor at the time, Estes set in motion an intricate and secret plan to form a competing claims adjustment business using Charles Taylor's goodwill, Confidential Information, clients, employees, and independent contractors—all in direct violation of his restrictive covenants.

44.     Specifically, on December 21, 2022, Estes sent an email from his Charles Taylor email account (roy.estes@charlestaylor.com) to a company called Business Income Loss Group ("BI Loss"), stating that he was seeking "Financial Analysts to help me Map[] out a realistic budget for building and launching [a] new claims service," along with "Financial modeling to determine

cashflow needed to startup and maintain a new business," "Financial outlooks for [the] future," and a "financial business plan." BI Loss responded that they could help, and asked for a call. (A true and correct copy of this December 21, 2022 email is attached hereto as **Exhibit E**.)

45.     Next, on December 30, 2022, BI Loss sent Estes an email stating: "Per our conversation last week, we would be glad to assist you in the analysis and preparation of a financial model.  In order to determine startup cashflow and maintenance of a new business and to calculate a sound valuation and business plan, we will need to gather some information." The email then set forth a list of questions and requests for information from Estes. (A true and correct copy of this email exchange is attached hereto as **Exhibit F**.)

46.     Estes responded to the list of questions the same day, and his responses to three of the questions were particularly noteworthy:

(a)     In response to the request for "Book of business for each employee, if known, or approximate," Estes responded: "**Aggregate 2M annually**."

(b)     In response to the request for "Level of training expected (are employees/contractors experienced? Do they have a book of business that they will be bringing with them?," Estes responded: "**They Bring Books, All experienced and working**."

(c)     In response to the question of what the "Corporate structure" would be, Estes responded: "**Already have LLC - EIN- Company Incorporated in 2010 or so?**" Estes's response also contained a link to that company's profile on the Florida Department of State's Division of Corporations website. The company is Claims Management Group, LLC, which was formed in 2013 and reinstated on January 3, 2023.

(A true and correct copy of this email exchange is attached hereto as **Exhibit G**.)

47.     A few days later, on January 2, 2023, at BI Loss's request, Estes and BI Loss entered into a Confidentiality and Non-Disclosure Agreement. (*See* Ex. G.) Notably, this email chain copied both Estes's Claims Management email account (roy.estes@cmgclaims.com) and his Charles Taylor email account. Although Charles Taylor is not a party to that Confidentiality and

Non-Disclosure Agreement, Charles Taylor will not disclose the subsequent communications and documents exchanged between Estes and BI Loss, except to state that those documents and communications reveal that Estes's business plan contemplated annual revenue in Claims Management's first year of business at $1.2 million.

48.     Estes did not inform Charles Taylor of his correspondence with BI Loss.

49.     Armed with a business plan, Estes moved to the next stage of his secret plan: hiring employees. On January 10, 2023, Estes exchanged emails with ADP about obtaining health and benefits plans for Claims Management. That exchange showed that Claims Management intended to hire Andrew Sanchez, then a Charles Taylor employee, and Craig Halye, then an independent contractor providing services to Charles Taylor—again, a direct violation of his nonsolicitation obligations. (A true and correct copy of this email exchange is attached hereto as **Exhibit H**.)

50.     Estes was fully aware of his restrictive covenants with Charles Taylor at the time of these communications. Indeed, on January 11, 2023, Estes's assistant, at Estes's request, sent him unexecuted copies of Charles Taylor's offer letter and Restrictive Covenants Agreement. (A true and correct copy of this January 11, 2023 email is attached hereto as **Exhibit I**.)

51.     Estes was undeterred by the terms of the Restrictive Covenants Agreement.  On January 12, 2023, he began forwarding a series of emails related to renewed licenses in various jurisdictions from his Charles Taylor email account to his Claims Management email account.

52.     Next, on January 13, 2023, during an email exchange with a Charles Taylor customer, Peninsula Insurance Bureau ("Peninsula"), Estes blind-copied Halye's Claims Management email account on the exchange in order to transmit a Charles Taylor report generated for Peninsula to Claims Management. (A true and correct copy of this email chain is attached hereto as **Exhibit J**.)

53.     Then, on January 14, 2023, Estes sent a meeting invitation via Microsoft Teams to Sanchez and Halye (both at their Charles Taylor email addresses), and to a non-Charles Taylor employee, Linda Powell. The title of the meeting invitation—"Future"—indicates the discussion surrounded Estes's and Claims Management's plans to compete with Charles Taylor. (A true and correct copy of the January 14, 2023 meeting invitation is attached hereto as **Exhibit K**.)

54.     Furthering his plan to unlawfully compete, on January 15, 2023, Estes instructed his assistant at Charles Taylor to send him "a list of open active cases - not including those claims that are waiting on POL, or final invoice even if they're ready for final invoice." Estes's assistant compiled the list on January 16, 2023, and, on January 20, 2023, Estes forwarded that list from his Charles Taylor email address to his Claims Management email address. Upon information and belief, Estes requested that list and then forwarded it to his Claims Management email address for the purpose of diverting business that he had obtained while employed by Charles Taylor to Claims Management.

55.     In similar fashion, on January 18, 2023, Estes forwarded to his Claims Management email address a January 15, 2023 request from a Charles Taylor customer, Brown & Brown Insurance, that had come to his Charles Taylor email account. (A true and correct copy of this email is attached hereto as **Exhibit L**.)

56.     Estes didn't stop there. In a brazen move, on January 21, 2023, he sent two emails from his Claims Management email account to his Charles Taylor email address—one email with instructions on how to download and export bookmarks, and the other with instructions on how to download and export a list of contacts from his email account. (True and correct copies of these emails are attached hereto as **Exhibits M** and **N**, respectively.) Upon information and belief, Estes

downloaded the list of contacts contained in his Charles Taylor email account and transferred that list to Claims Management.

57.     Following this, on January 22, 2023, Estes sent an email to one of Charles Taylor's customers, Catalytic Claims Services ("Catalytic"), explaining that he was leaving Charles Taylor and would be operating under Claims Management effective February 1, 2023. In pertinent part, Estes confirmed that Sanchez and Halye would be joining Claims Management: "My immediate staff team is Andrew Sanchez (regional general adjuster), Craig Halye (executive general adjuster & COO), Roy Estes (executive general adjuster), Linda Powell (admin and claims support) and several other following very soon." Additionally, Estes requested that Catalytic continue using his services rather than Charles Taylor's services: "While we respect [Charles Taylor], We pray that you will request me and my team to continue our good claims serves [sic], and your claims provider of choice." But most egregiously, Estes's email deceptively and falsely stated that he would "continue to work with Charles Taylor and their adjusters on an at will basis and in the best interest of the claim and claim handling"—giving the impression that Charles Taylor had consented to this solicitation when it was not even aware of it. (A true and correct copy of this email is attached hereto as **Exhibit O**.)

58.     That same day, Estes sent similar emails to two more clients of Charles Taylor, Peninsula and Nearmap, requesting that they continue business with Claims Management and again giving the false impression of Charles Taylor's consent. (True and correct copies of these emails are attached hereto as **Exhibits P** and **Q**, respectively.)

59.     Catalytic and Peninsula both confirmed via email that they would continue working with Estes, constituting an immediate and irreparable loss of business to Charles Taylor. (*See* Ex. O ("We would like you and your team to continue to handle all claims assigned to you. We look

forward to continuing to work with you and your team as the claims are transitioned over to [Claims Management] and brought to resolution on behalf of our policyholders and carrier partners."); Ex. P ("Thank you Roy,   I look forward to continuing to work with you.").)

**Charles Taylor Discovers Estes's Competitive Activities and Terminates Him for Cause**

60.     On January 23, 2023, Estes called Robert Arnold, a Managing Director at Charles Taylor, to tell him that Estes had formed his own company and had proposed to Charles Taylor to continue working as an independent contractor (i.e., a "1099") rather than as an employee. Estes confirmed that he had provided notice of his resignation to Cullen Sophy, Charles Taylor's Chief Executive Officer for the United States, on January 20, 2023. During that phone conversation, Estes also offered Mr. Arnold a position to join his new company. Mr. Arnold declined the offer, and then had to end the call in order to attend a previously scheduled call.

61.     Later that same day, Estes forwarded Mr. Sophy and Mr. Arnold a copy of his January 22 email exchange with Catalytic, including Catalytic's confirmation that it would continue working with Estes. In that email, Estes asked Mr. Sophy and Mr. Arnold: "Are we doing the 1099 thing? I would respect an answer." (Ex. O.)

62.     These January 23, 2023 communications revealed to Charles Taylor for the first time Estes's plan to compete with Charles Taylor, solicit, and convert Charles Taylor's clients, and solicit and hire Charles Taylor's employees and contractors.

63.     Upon receiving these emails, Charles Taylor was stunned. Estes's email communication with Catalytic revealed that he had no intention of honoring his contractual commitments to Charles Taylor and confirmed that he had formed a competing business while still working for Charles Taylor.

64.     Indeed, on January 23, 2023, Catalytic began sending new work to Claims Management—and not to Charles Taylor—in accordance with Estes's request. That same day, Estes also forwarded from his Charles Taylor email account to his Claims Management email account confidential and protected information relating to a series of claims that Charles Taylor was handling for Catalytic and that Estes intended to convert to Claims Management.  (True and correct copies of these emails are attached hereto as **Exhibits R** and **S**, respectively.)

65.     In other instances, Estes did not alert Charles Taylor customers to his change of employment, and simply started emailing them from his Claims Management email account and soliciting business for—or the conversion of business to—Claims Management. (True and correct copies of examples of such emails are attached hereto as **Exhibits T** and **U**, respectively.)

66.     Upon learning that Estes was violating his contractual obligations, Charles Taylor promptly terminated Estes's access to the Company's computer systems.

67.     On January 25, 2023, Charles Taylor terminated Estes's employment for cause.

68.     Unfazed, Estes continued to press forward.  On January 25, 2023—the same day that his employment was terminated—Estes attended the 2023 Annual Meeting and Education Conference of the Loss Executives Association, in Fort Lauderdale, Florida.  Mr. Arnold also attended this conference on behalf of Charles Taylor.  At the conference, Mr. Arnold personally observed Estes soliciting Charles Taylor's clients using business cards for his new company, Claims Management, and wearing apparel branded with Claims Management's logo.

69.     On January 30 and 31, 2023, Estes caused Sanchez—who himself was subject to his own Restrictive Covenants Agreement—to breach his covenants to Charles Taylor by having Sanchez send numerous emails from Sanchez's Charles Taylor email account to a Claims Management email address. These emails attached numerous Charles Taylor documents

containing protected and confidential information, including payment recommendations that had been issued to clients, Xactimate files, and other client-specific documentation that Sanchez had obtained in the course of his employment with Charles Taylor.

70.     Sanchez—who had worked closely with Estes during his time with Charles Taylor—resigned from Charles Taylor shortly thereafter.

71.     In the hopes that Estes would respect his contractual commitments, Charles Taylor put Estes on notice that his competitive activities constituted violations of his restrictive covenants. On January 30, 2023, Charles Taylor sent Estes a letter identifying his contractual breaches and reminding him of his obligations to the Company as set forth in the Offer Letter, the Restrictive Covenants Agreement, the Deed of Adherence, and the Investment and Shareholders' Deed. Charles Taylor demanded that Estes cease and desist from those violations and confirm his compliance by February 3, 2023. (A true and correct copy of the January 30, 2023 letter is attached hereto as **Exhibit V**.)

72.     Estes did not respond to the Company's January 30, 2023 letter.

73.     Charles Taylor, through outside counsel, sent a follow-up cease-and-desist letter on February 6, 2023, which demanded written assurances of compliance by February 9, 2023. (A true and correct copy of the February 6, 2023 letter is attached hereto as **Exhibit W**.)

74.     In no uncertain terms, Estes benefitted significantly during his employment from Charles Taylor's goodwill, client relationships, business strategies, marketing, and client support, and gained protected and confidential information about Charles Taylor's customers, business partners, pricing strategies, and business activities that he would not have obtained but for his employment with Charles Taylor.  Now, Estes has sought to convert, and continues to seek to convert, that goodwill, confidential information, and other protected business interests for his own

benefit and the benefit of his new company, Claims Management, all in direct competition with Charles Taylor.

75.     The impact of Estes's breaches cannot be understated. Between 2021 and 2022, Charles Taylor's total revenues associated with Catalytic and Peninsula alone exceeded $2,000,000.00.  Estes personally generated approximately $280,000 in revenue from Catalytic in 2022 and $370,000 in revenue from Catalytic in 2021.  Sanchez generated approximately $75,000 in revenue from Catalytic in 2022 and $92,000 in revenue from Catalytic in 2021. Upon information and belief, Estes has or is attempting to procure business from other high-value customers and business partners of Charles Taylor, including but not limited to Brown & Brown Insurance and Velocity Risk.

76.     The harm that would be caused by Estes's continued solicitation of Charles Taylor's clients and customers and continued use and disclosure of Charles Taylor's confidential information includes (1) the loss of Charles Taylor's business goodwill and confidential and proprietary information; (2) the loss of Charles Taylor's competitive advantage; (3) the loss of Charles Taylor's market share; (4) reputational harm; (5) the loss of additional business from Charles Taylor's existing clients—as has already occurred with Catalytic; (6) the loss of additional client relationships—including those clients that Estes has already solicited for Claims Management Group; and (7) the loss of additional employee and consultant relationships—as has already occurred with Sanchez and Halye. Thus, by competing and continuing to compete with Charles Taylor in breach of his contractual obligations, Estes continues to harm Charles Taylor's business, thereby necessitating this lawsuit.

## COUNT I – BREACH OF CONTRACT
## (BREACH OF THE RESTRICTIVE COVENANTS AGREEMENT)

77.     Plaintiff repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

78.     The Restrictive Covenants Agreement is a valid and binding contract between Charles Taylor and Estes.

79.     Under the Restrictive Covenants Agreement, Estes agreed, in pertinent part, to the following restrictive covenants:

(a)     To not contact, solicit, accept solicited business from, provide services to, or in any way interfere with the Company's relationship with any of its current or prospective clients, customers, or suppliers that Estes "directly interacted" with, that an employee supervised by Estes "directly interacted" with, or about whom Estes "obtained or received non-public information," both during his employment with Charles Taylor and for a period of one year after the termination of his employment (*see* Ex. A § 7);

(b)     To not solicit for employment or hire or assist in the solicitation or hiring of any employee, consultant, or independent contractor who "reported" to Estes, "worked with" Estes, or "worked for or with the same customer(s)" as Estes, both during his employment with Charles Taylor and for a period of one year after the termination of his employment (*see id.* § 8);

(c)     To not disclose any Confidential Information belonging to Charles Taylor during his employment and for five years thereafter (*see id.* §§ 1.2, 5.1, 5.2); and

(d)     To return all Company property immediately upon the termination of his employment with Charles Taylor (*see id.* § 6).

80.     However, as set forth in detail above, Estes breached the Restrictive Covenants Agreement by improperly and without justification:

(a)     Soliciting business from Charles Taylor's clients, customers, and business partners that he interacted with during his employment with Charles Taylor, including, without limitation, Catalytic, Peninsula, Brown & Brown Insurance, and Velocity Risk, both during and after his employment in violation of § 7 of the Restrictive Covenants Agreement;

(b)     Soliciting and ultimately hiring Sanchez, a Charles Taylor employee, and Halye, a Charles Taylor independent contractor—both of whom interacted with the same clients, customers, and/or business partners that Estes has been actively soliciting—to work for Claims Management, both during and after his employment in violation of § 8 of the Restrictive Covenants Agreement;

(c)     Disclosing Charles Taylor's Confidential Information to Claims Management and, upon information and belief, to clients, customers, and/or business partners of Charles Taylor in an effort to unlawfully undercut Charles Taylor's business in violation of §§ 1.2, 5.1, and 5.2 of the Restrictive Covenants Agreement; and

(d)     Failing to return Charles Taylor's property upon the termination of his employment and sending such property to his Claims Management email account in violation of § 6 of the Restrictive Covenants Agreement.

81.     Charles Taylor, on the other hand, faithfully performed its obligations under the Restrictive Covenants Agreement.

82.     As a direct and proximate result of Estes's breach of the Restrictive Covenants Agreement, Charles Taylor has suffered significant damages, including attorneys' fees and costs, in an amount to be determined at trial.

### COUNT II – BREACH OF CONTRACT
### (BREACH OF THE INVESTMENT AND SHAREHOLDERS' DEED)

83.     Plaintiff repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

84.     The Investment and Shareholders' Deed is a valid and binding contract between Charles Taylor (as Jewel Topco's subsidiary) and Estes, of which Estes became a party through the Deed of Adherence.

85.     Under the Investment and Shareholders' Deed, Estes agreed, in pertinent part, that:

(a)     During his employment, he would not "be concerned in any business (other than the business of the Group) whether or not in competition with any business carried on by the Group, without prior written notification of the same" (Ex. D § 18.3(a)); and

(b)     For six (6) months after the cessation of his employment, he would not "be concerned in any business within any country which, in the 12 month period immediately preceding the [date of the cessation of his employment], competes with the business of all or any part of the Group," including its subsidiary, Charles Taylor (*see id.* § 18.3(b)).

86.     However, as set forth in detail above, Estes breached § 18.3(a) and (b) of the Investment and Shareholders' Deed by improperly and without justification working on behalf of Claims Management to compete with Charles Taylor while still employed by Charles Taylor, and then competing with Charles Taylor immediately after the termination of his employment.

87.     Charles Taylor, on the other hand, faithfully performed its obligations under the Investment and Shareholders' Deed.

88.     As a direct and proximate result of Estes's breach of the Investment and Shareholders' Deed, Charles Taylor has suffered significant damages, including attorneys' fees and costs, in an amount to be determined at trial.

## COUNT III – BREACH OF FIDUCIARY DUTY / DUTY OF LOYALTY

89.     Plaintiff repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

90.     Under New York law, which is the choice of law under the Restrictive Covenants Agreement (*see* Ex. A §§ 10.4, 12), Estes as an employee of Charles Taylor owed the fiduciary duties of good faith and loyalty to Charles Taylor in the performance of his duties.

91.     So long as Estes remained employed by Charles Taylor, the Company depended upon Estes to act only in Charles Taylor's best interests.

92.     An employee may breach his or her fiduciary duties to the employer by improperly using the employer's time, resources, or proprietary information to form a new business and promote themselves while still working for the employer.

93.     Here, as described in detail above, Estes did just that, undertaking a flurry of activity in late 2022 and early 2023 to set up Claims Management as a competing business and solicit clients, customers, business partners, employees, and independent contractors of Charles Taylor—all while still employed by Charles Taylor and using his Charles Taylor email account and Confidential Information obtained through his employment with Charles Taylor to do so. Estes's conduct was a quintessential breach of his fiduciary duty and/or duty of loyalty.

94.     As a direct and proximate cause of Estes's breach of his fiduciary duty and/or duty of loyalty owed to Charles Taylor, Charles Taylor has suffered, and will continue to suffer, damages as a result of Estes's conduct in an amount to be determined at trial.

95.     Further, in breaching his fiduciary duty and/or duty of loyalty to Charles Taylor, Estes acted with malice and reckless indifference to the rights of Charles Taylor.

## COUNT IV – UNFAIR COMPETITION

96.     Plaintiff repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

97.     To establish a cause of action for relief based on unfair competition, a plaintiff must demonstrate that the defendant wrongfully diverted the plaintiff's business to itself.

98.     Here, that is precisely what has occurred and continues to occur. As described above, in late 2022 and early 2023, Estes undertook significant efforts to set up Claims Management as a competing business and solicit clients, business partners, employees, and independent contractors of Charles Taylor—including through the use of Charles Taylor's goodwill and Confidential Information—all for the purpose of wrongfully diverting Charles Taylor's business to himself and his entity, Claims Management.

99.     As set forth above, these actions constituted clear breaches of his post-employment obligations to Charles Taylor under his applicable agreements, and breaches of his fiduciary duty

and/or duty of loyalty. Further, as pleaded below, these actions constituted tortious interference with contract, tortious interference with business relations, and misappropriation of confidential information.

100.     By and through this conduct, Estes sought to compete unfairly with Charles Taylor.

101.     These willful and intentional acts interfered with Charles Taylor's ability to conduct its business and tampered Charles Taylor's reasonable expectations that Estes would honor his post-employment obligations.

102.     Estes's conduct is a direct and proximate cause of Charles Taylor's harm and damages.

103.     Further, in unfairly competing with Charles Taylor, Estes acted with malice and reckless indifference to Charles Taylor's rights.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT

104.     Plaintiff repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

105.     As described more fully above, Andrew Sanchez is a former employee of Charles Taylor who worked closely with Estes while both were employed by Charles Taylor.

106.     As an employee of Charles Taylor, Sanchez entered into a Restrictive Covenants Agreement under which he agreed to the same contractual obligations as Estes, including the obligation to protect and not disclose Charles Taylor's Confidential Information and the obligation not to solicit Charles Taylor's clients, customers, and business partners.

107.     The Restrictive Covenants Agreement between Sanchez and Charles Taylor is a valid and binding contract.

108.     As someone who worked closely with Sanchez during his time at Charles Taylor, Estes was well aware that Sanchez was subject to a Restrictive Covenants Agreement, and was

familiar with its terms because those terms were substantially identical to the terms of Estes's own Restrictive Covenants Agreement.

109.    In forming a competing venture, Estes intentionally procured Sanchez's breach of the Restrictive Covenants Agreement, including, without limitation, by directing Sanchez to send Charles Taylor's Confidential Information from Sanchez's Charles Taylor email account to his Claims Management email account—a direct violation of the Restrictive Covenants Agreement.

110.    Sanchez's breach of the Restrictive Covenants Agreement was not justified because he contractually agreed ***not*** to engage in such conduct and instead chose to join Estes in unfairly competing against Charles Taylor. Further, Estes's procurement of Sanchez's breach was similarly unjustified because the breach was procured in connection with Estes's efforts to unlawfully compete with Charles Taylor.

111.    Moreover, Sanchez's breach would not have occurred but for Estes's actions; indeed, Sanchez would still be employed by Charles Taylor had Estes not unlawfully solicited Sanchez to join Claims Management.

112.    As a direct and proximate result of Estes's interference with Sanchez's Restrictive Covenants Agreement, Charles Taylor has suffered damages in an amount to be determined at trial.

113.    Further, in tortiously interfering with Charles Taylor's Restrictive Covenants Agreement with Sanchez, Estes acted with malice and reckless indifference to Charles Taylor's rights.

### COUNT VI – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS / PROSPECTIVE ECONOMIC ADVANTAGE

114.    Plaintiff repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

115.    As described more fully above, Charles Taylor's business is dependent upon its goodwill and relationships with its customers and business partners, including Catalytic, Peninsula, Brown & Brown Insurance, and Velocity Risk.

116.    As an employee of Charles Taylor, Estes was aware of Charles Taylor's goodwill and relationships with these companies. Indeed, through Charles Taylor, Estes generated significant revenue from these companies for Charles Taylor's benefit.

117.    Estes intentionally interfered with and injured Charles Taylor's goodwill and relationships with these companies because Estes has successfully solicited business from some or all of these companies in violation of his Restrictive Covenants Agreement, including but not limited to Catalytic and Brown & Brown Insurance.

118.    Estes's intentional interference with these relationships was done through improper and unfair means because he acted covertly to solicit business from these companies for Claims Management's benefit—while still employed by Charles Taylor—in a clear case of unfair competition and in direct violation of his fiduciary duty and/or duty of loyalty to Charles Taylor.

119.    As a direct and proximate result of Estes's interference with Charles Taylor's relationships with these companies, Charles Taylor has suffered damages in an amount to be determined at trial.

120.    Further, in tortiously interfering with Charles Taylor's relationships with these companies, Estes acted with malice and reckless indifference to Charles Taylor's rights.

**COUNT VII – MISAPPROPRIATION OF CONFIDENTIAL INFORMATION**

121.    Plaintiff repeats and realleges each and every allegation contained in the foregoing Paragraphs as if fully set forth herein.

122.    As described more fully above, Estes obtained access to Charles Taylor's Confidential Information throughout the course of his employment, including but not limited to

information containing or concerning Charles Taylor's business strategies and opportunities, customers, prospective customers, current and prospective business partners, pricing practices, contracts, and marketing strategies.

123.    Toward the end of his employment with Charles Taylor, Estes forwarded a substantial number of Charles Taylor emails, documents, reports, and other Confidential Information to his Claims Management email account. Upon information and belief, Estes is using that Confidential Information for the benefit of himself and Claims Management to undercut Charles Taylor's competitive position in the market and obtain business that would otherwise belong to Charles Taylor but for Estes's actions. For example, upon information and belief, the decision of Catalytic to continue working with Estes was, in whole or in part, the result of Estes underpricing his services as compared to Charles Taylor in an effort to gain an unfair competitive advantage over Charles Taylor.

124.    Aside from his contractual prohibitions against such misappropriation, in using and misappropriating Charles Taylor's Confidential Information in this manner, Estes breached the independent duties of good faith, fair dealing, and loyalty that he owed to Charles Taylor not to exploit its Confidential Information for the benefit of himself and others.

125.    Additionally, Estes has engaged in deceit by responding to customers and/or business partners through his Claims Management email without alerting them to his change of employment.

126.    As a direct and proximate result of Estes's misappropriation of Charles Taylor's Confidential Information, Charles Taylor has suffered damages in an amount to be determined at trial.

127.     Further, in misappropriating Charles Taylor's Confidential Information, Estes acted with malice and reckless indifference to Charles Taylor's rights.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Estes as follows:

1.     With respect to Count I, Charles Taylor demands judgment in its favor and against Estes for:

    (a)     actual damages that Charles Taylor is entitled to recover as a result of Estes's breaches of his Restrictive Covenants Agreement;

    (b)     incidental and consequential damages as permitted by law;

    (c)     an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Estes's breaches of contract;

    (d)     preliminary and permanent injunctive relief prohibiting Estes from violating the Restrictive Covenants Agreement;

    (e)     Charles Taylor's attorneys' fees and costs incurred in enforcing the terms of the Restrictive Covenants Agreement, as permitted by the Restrictive Covenants Agreement;

    (f)     pre- and post-judgment interest; and

    (g)     all such other relief as this Court deems appropriate.

2.     With respect to Count II, Charles Taylor demands judgment in its favor and against Estes for:

    (a)     actual damages that Charles Taylor is entitled to recover as a result of Estes's breaches of the Investment and Shareholders' Deed;

    (b)     incidental and consequential damages as permitted by law;

    (c)     an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Estes's breaches of contract;

    (d)     preliminary and permanent injunctive relief prohibiting Estes from violating the Investment and Shareholders' Deed;

(e)    Charles Taylor's attorneys' fees and costs incurred in enforcing the terms of the Investment and Shareholders' Deed;

(f)    pre- and post-judgment interest; and

(g)    all such other relief as this Court deems appropriate.

3.    With respect to Count III, Charles Taylor demands judgment in its favor and against Estes for:

(a)    actual damages that Charles Taylor is entitled to recover as a result of Estes's breaches of his fiduciary duty and/or duty of loyalty;

(b)    incidental, consequential, and punitive damages as permitted by law;

(c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Estes's breaches of his fiduciary duty and/or duty of loyalty;

(d)    Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

(e)    pre- and post-judgment interest; and

(f)    all such other relief as this Court deems appropriate.

4.    With respect to Count IV, Charles Taylor demands judgment in its favor and against Estes for:

(a)    actual damages that Charles Taylor is entitled to recover as a result of Estes's unfair competition;

(b)    incidental, consequential, and punitive damages as permitted by law;

(c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Estes's unfair competition;

(d)    preliminary and permanent injunctive relief prohibiting Estes from engaging in unfair competition;

(e)    Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

(f)    pre- and post-judgment interest; and

(g)     all such other relief as this Court deems appropriate.

5.     With respect to Count V, Charles Taylor demands judgment in its favor and against

Estes for:

(a)     actual damages that Charles Taylor is entitled to recover as a result of Estes's tortious interference with contract;

(b)     incidental, consequential, and punitive damages as permitted by law;

(c)     an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Estes's tortious interference with contract;

(d)     preliminary and permanent injunctive relief prohibiting Estes from tortiously interfering with Charles Taylor's contract with Sanchez and/or any other current or former employee of Charles Taylor;

(e)     Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

(f)     pre- and post-judgment interest; and

(g)     all such other relief as this Court deems appropriate.

6.     With respect to Count VI, Charles Taylor demands judgment in its favor and against

Estes for:

(a)     actual damages that Charles Taylor is entitled to recover as a result of Estes's tortious interference with business relations/prospective economic advantage;

(b)     incidental, consequential, and punitive damages as permitted by law;

(c)     an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Estes's tortious interference with business relations/prospective economic advantage;

(d)     preliminary and permanent injunctive relief prohibiting Estes from tortiously interfering with Charles Taylor's relationships with customers and business partners;

(e)     Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

      (f)     pre- and post-judgment interest; and

      (g)    all such other relief as this Court deems appropriate.

7.    With respect to Count VII, Charles Taylor demands judgment in its favor and against Estes for:

      (a)    actual damages that Charles Taylor is entitled to recover as a result of Estes's misappropriation of Charles Taylor's Confidential Information;

      (b)    incidental, consequential, and punitive damages as permitted by law;

      (c)    an equitable accounting, disgorgement, forfeiture, and delivery to Charles Taylor of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Estes's misappropriation of Charles Taylor's Confidential Information;

      (d)    preliminary and permanent injunctive relief prohibiting Estes from misappropriating Charles Taylor's Confidential Information;

      (e)    Charles Taylor's attorneys' fees and costs incurred in prosecuting this claim, to the extent permitted by law;

      (f)     pre- and post-judgment interest; and

      (g)    all such other relief as this Court deems appropriate.

Respectfully submitted,

Dated:  February 16, 2023

**BLANK ROME LLP**

/s/ John C. Kessler
John C. Kessler
1271 Avenue of the Americas
New York, NY 10020
Phone: 212.885.5154
Fax: 917.332.3737
John.Kessler@BlankRome.com

Michael A. Iannucci (*pro hac vice forthcoming*)
Frederick G. Sandstrom (*pro hac vice forthcoming*)
Samuel M. Ventresca (*pro hac vice forthcoming*)
BLANK ROME LLP
One Logan Square

Philadelphia, PA 19103
Phone: (215) 569-5679 / 5625
Fax: (215) 832-5679
Email: Michael.Iannucci@BlankRome.com
       Gus.Sandstrom@BlankRome.com
       Samuel.Ventresca@BlankRome.com

*Attorneys for Plaintiff LAD (Aviation), Inc. d/b/a*
*Charles Taylor Adjusting*

## **VERIFICATION**

I, Robert Arnold, in my capacity as Managing Director of Plaintiff LAD (Aviation), Inc. d/b/a Charles Taylor Adjusting, hereby state that I have read and am familiar with the facts set forth in the foregoing Verified Complaint, that I am authorized to execute this Verification on behalf of Plaintiff, and that the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

This Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

Dated: February 15, 2023

_____
Robert Arnold